[Sac. No. 7042.   In Bank.   Dec. 15, 1959.]

JOHN BISHEL et al., Respondents, v. T. R. FARIA,
Appellant.

F. Louis Gomes and Frank E. Wyland, Jr., for Appellant.

Sherwood Green, Denslow Green, Green, Green & Bartow and Bartow & Christiansen for Respondents.

WHITE, J.—This is an action to adjudicate the common boundary line of properties which adjoin in the middle of the San Joaquin River, and to quiet the plaintiffs' title in and to the whole of a so-called island. The issues presented are, where is the middle of the river located as a matter of law and does the evidence support the trial court's finding as to the location of the boundary line.

The plaintiffs' property is situate in Madera County on the north side of the river. The defendant's property is situate in Fresno County on the opposite or south side of the river. The river flows in a general westerly direction at

this point and is nonnavigable. The parties have stipulated that their common boundary line is the middle or thread of the river and that this line is coterminous with the existing boundary line between Fresno and Madera Counties at this location. It is the plaintiffs' contention that this boundary is the center line of the main channel of the river and that it is to be determined by measuring the width of the river between the low banks during the eight months of average flow. The defendant, on the other hand, contends that it is the center line of the river as measured between the high banks during the normal high flow in the spring months. The dispute arose over the ownership of a sand, gravel and alluvial deposit located in the river-bed offshore from the plaintiffs' property. If the plaintiffs are correct in their contention this deposit or island is located entirely on their side of the river. If the defendant is correct a portion of this island belongs to him. He has appealed from a judgment in favor of the plaintiffs.

This island has existed beyond the memory of any of the witnesses at the trial in substantially its present condition, with the exception of recent gravel excavations on its north side and the construction of a levee at its eastern end. During eight or nine months of the year it is affixed to the north shore by dry land and appears to be a part thereof. There is some vegetation along the southern bank of the island bordering the main or south channel of the river, and during the greater part of the year cattle can cross dryshod from the mainland. During eight months of the year the river flow is from less than 1,000 to 3,000 second feet. During April, May, June and portions of some other months the water volume increases from snow runoffs in the mountains and spring rains, from 5,000 to 10,000 second feet. This is a normal anticipated flow, although periods of drought and flood have been experienced. During these spring months of ordinary high flow water runs in the channel north of the island between it and the permanent or high banks on the plaintiffs' side of the river. In periods of flood the island may be inundated. During recent years the flow in the river has to a great extent been controlled by the Friant Dam. However, there was evidence that prior to this controlled flow or to the construction of the levee or the gravel excavations, the same conditions have always prevailed and that during the major portion of the year the greater flow of the water is in the south channel. In dry years it flows only in the south channel.

Neither the descriptions in the parties' deeds nor the designations by the Legislature of the county boundaries are conclusive as to the exact location of the middle line of the San Joaquin River at this point. The calls in the plaintiffs' deed describe their land as lying ''northerly from the center line of the existing main channel of the San Joaquin River.'' The date of this deed is not shown but no important changes appear to have been made in the channel at this location. The defendant's deed carries the description by metes and bounds, which by reference to the maps placed in evidence by him fix his boundary as the center of the river. ██ Under pertinent code provisions, any doubt as to the location of this boundary is resolved by construing it as being the ''middle of the stream''[1] or the ''thread of the stream.''[2] In describing the county boundaries the Legislature has provided that the northern boundary of Fresno County is ''on the southern line of Madera'' County (Gov. Code, § 23110) and has fixed the southern line of Madera County as ''up the middle of said [the San Joaquin] river'' (Gov. Code, § 23120). ██ Unless the Legislature otherwise declares (Gov. Code, § 23070) in the designation of county boundary lines the words ''up a river'' mean up ''the middle of the main channel thereof.'' (Gov. Code, § 23074.)

██ No difference appears in the meaning intended by the use of the word ''up the middle of the San Joaquin River'' and ''up the middle of the main channel.'' Normally these words have the same meaning.[3] ██ Where the Legislature intends to designate a county boundary as being other than the middle of a river or creek it uses appropriate language to express that intention. (See Gov. Code, § 23124,

---

[1]Civil Code, section 830. ''Except where the grant under which the land is held indicates a different intent . . . when it borders upon any . . . [nonnavigable, nontidal] water, the owner takes to the middle of the . . . stream.''

[2]Code of Civil Procedure, section 2077. [Rules for construing descriptions of lands.] ''. . . 4. When a . . . stream of water not navigable, is the boundary, the rights of the grantor to the . . . thread of the stream are included in the conveyance, except where the . . . thread of the stream is held under another title.''

[3]The phrases ''the middle of the river'' and the ''middle of the main channel'' when applied to rivers as boundaries between states mean the center line of the main channel, or as it is most frequently expressed, the thread of the stream. (*Buttenuth* v. *St. Louis Bridge Co.* 123 Ill. 535 [17 N.E. 439, 443, 5 Am.St.Rep. 545]; Farnham, Waters and Water Rights (1904), vol. I, pp. 30, 32.) The same rule applies as to the boundary line between cities and towns. Gould on Waters and Water Rights, 3d ed., p. 387, § 202.

"down the northern side [of Chowchilla Creek] and on high-water mark. . . .") Where more than one main channel exists the Legislature uses appropriate language to indicate the boundary intended. (See Gov. Code, § 23103, "north fork of the [Mokelumne River] . . . east of the source of the south fork of the south fork of the Consumnes River"; section 23107, "west and main channels . . . [of the San Joaquin River] as laid down on Gibe's map"; section 23109, "north fork of the American River . . . south fork of the middle fork of the . . . River.") The interchangeable use of the words "middle of the river" and "up the river" (i.e., up the middle of the main channel, Gov. Code, § 23074) appears in the descriptions in sections 23104 and 23111, describing, repectively, the adjoining counties of Butte and Glenn. The Sacramento River is part of their common boundary line. Government Code, section 23104, describing the river boundary of Butte County uses the words "thence down said river to the southwest corner of the Llano Seco grant . . . thence . . . along the eastern boundary of Glenn. . . ." Section 23111, describing the river boundary of Glenn County, uses the words "thence southwest along said [Llano Seco] grant line to the southwest corner of said grant in the center of the Sacramento River; thence northerly, and following the meanderings thereof, along the center of said Sacramento River. . . ." ██ If there is any uncertainty in the statute describing the boundary, it will be construed liberally in support of the evident intention of the Legislature. (*County of Mariposa* v. *County of Madera*, 142 Cal. 50 [75 P. 572].)

██ Under the rule in this state and at common law the abutting owners on a nonnavigable, nontidal stream are deemed to be the owners "to the middle of the stream," "to the thread of the stream," or "to the filium aquae," as it is variously expressed. (Civ. Code, § 830; Code Civ. Proc., § 2077, subd. 4; *Estate of Mitchell*, 10 Cal.2d 628, 634 [75 P.2d 1048, 76 P.2d 1184]; *Rubel* v. *Peckham*, 94 Cal.App.2d 834, 837 [211 P.2d 883]; *Ford* v. *County of Butte*, 62 Cal. App.2d 638, 642 [145 P.2d 640]; *Drake* v. *Russian River Land Co.*, 10 Cal.App. 654, 660-661 [103 P. 167]; Gould on Waters, *supra* (1900), § 196, pp. 379-380; 2 Farnham, Waters and Water Rights, *supra*, § 415, p. 1456; 8 Am.Jur., Boundaries, § 22, p. 761; 93 C.J.S., Waters, § 71; 6 Thompson on Real Property (perm. ed.), § 3435, p. 658.) In the absence of statutory provisions the presumption is that county boundaries follow this same rule. 2 Farnham, *supra*, § 425, p. 1482.)

The thread of a stream has been defined as the middle line between the shores, taking it in the natural and ordinary stage of the water, at its medium height, neither swollen by freshet nor diminished by drought, irrespective of the depth of the channel or the lowest and deepest part of the stream. (*Holmes* v. *Haines*, 231 Iowa 634 [1 N.W.2d 746, 749]; *State* v. *Burton*, 106 La. 732 [31 So. 291, 292]; *Louisville Sand & Gravel Co.* v. *Ralston*, (Ky.App.) 266 S.W.2d 119, 121; *Warren* v. *Thomaston*, 75 Me. 329 [46 Am.Rep. 397]; *Trustees of Hopkins Academy* v. *Dickinson*, 63 Mass. (9 Cush.) 544, 552; *Boscawen* v. *Canterbury*, 23 N.H. 188; *State* v. *Muncie Pulp Co.*, 119 Tenn. 47 [104 S.W. 437, 443]; Gould, *supra*, § 198, p. 383; 2 Farnham, *supra*, § 413, p. 1454, n. 1; 6 Thompson, *supra*, § 3436, p. 661; 11 C.J.S., Boundaries, § 33, pp. 578-579; 8 Am.Jur., Boundaries, § 28.) The middle of the stream may be the same as the middle of the channel or it may be entirely different. (*Warren* v. *Thomaston, supra*, 46 Am.Rep. 397, 398-399.) Many of the cases which state this rule are concerned with navigable bodies of water.

The better rule appears to be that stated in *Horton* v. *Niagara, Lockport & Ontario Power Co.*, 231 App.Div. 386 [247 N.Y.Supp. 741, 752-753]: "In order to determine just where the center of the channel is, it is necessary to determine what constitutes such center line. . . . Water always seeks its lowest level. If the deepest part of a channel is well to one side, and the equidistant rule is applied, the riparian owner upon the shallow side would, in times of drouth, be shut off from access to the water which is supposed to flow past his door, without trespassing upon the lands of his neighbor, as the exact middle of the stream would be on dry land. In the very nature of things, the thread or center of a stream must be the line which would give to the owner upon either side access to the water, whatever its stage might be, and particularly at its lowest flow. Upon principle, therefore, it would appear that the thread of a nonnavigable river is the line of the water at its lowest stage." (This same rule was followed in *Hardt* v. *Orr*, 142 Neb. 460 [6 N.W.2d 589, 593]; *Micelli* v. *Andrus*, 51 Ore. 78 [120 P. 737, 741]; see 93 C.J.S., Waters, §§ 71, 72; 2 Farnham, *supra*, § 417, p. 1462.)

If there is a main channel through which the water flows at all times and an auxiliary channel which furnishes a passage for surplus waters in times of freshet, the center of the main channel has been held to be the thread of the stream.

(*Missouri* v. *Kentucky*, 11 Wall. (U.S.) 395 [20 L.Ed. 116];
*Cessill* v. *State*, 40 Ark. 501; *Pike* v. *Hood* [N.H.], 27 A.
139, 140; *Hardt* v. *Orr*, *supra*, 142 Neb. 460 [6 N.W.2d 589,
592]; 6 Thompson, *supra*, § 3437, p. 664.)   The main channel
has also been defined as that part of the bed over which the
principal volume of water flows.   (*St. Louis & St. Paul Packet
Co.* v. *Keokuk & H. Bridge Co.*, 31 F. 755, 757; Gould, *supra*,
§ 198.)

The determination of boundaries is a local matter.
The determination of what is the center of the stream does not
appear to have been definitely made in this state, insofar as
the settlement of a boundary line is concerned.   In *San Pedro
etc. R.R. Co.* v. *Simons Brick Co.*, 45 Cal.App. 57 [187 P.
62], cited by the plaintiffs, in construing a deed describing
property lying "near" the river, the court stated that it had
to define the location of the banks of the river in order to
decide the case and it held that ". . . where a nonnavigable
stream in fact exists within the legal definition of the term,
its banks must be located approximately at the edges of the
stream as the latter flows during the time of normal water."
(*Id.*, at p. 62.)   The court did not there determine what is a
"time of normal water."

In urging that the high banks of the river should be used
in determining this boundary line, the defendant urges that
the waters running in the San Joaquin River through these
properties during the spring months of high substantial flow
are not storm waters but constitute the usual and ordinary
flow of the river, citing *Herminghaus* v. *Southern Calif.
Edison Co.*, 200 Cal. 81 [252 P. 607], and *Miller & Lux* v.
*Madera Canal etc. Co.*, 155 Cal. 59 [99 P. 502, 22 L.R.A.N.S.
391].   Neither of those cases involved the determination of
the boundary line between riparian owners nor the determi-
nation of what is a time of normal water for fixing the main
channel or the width of the stream for boundary purposes.
Likewise *Ventura Land & Power Co.* v. *Meiners*, 136 Cal.
284, 290 [68 P. 818, 89 Am.St.Rep. 128], also cited by the
defendant, was concerned with the right of use of water by
riparian owners.   It determined that where there are two
sets of banks, low banks which confine the stream at low
water and high or fast banks which confine it in its entire
width at the period of highest flow, that the high banks
must be taken as the true boundaries of the river.

The high banks are true boundaries of the river
for certain purposes.   However, for determining where the
main channel of a river lies the high banks are not necessarily

the boundaries of the river. Under the authorities herein cited (*Horton* v. *Niagara, Lockport & Ontario Power Co., supra,* 247 N.Y.Supp. 741; *Hardt* v. *Orr, supra,* 6 N.W.2d 589; *Micelli* v. *Andrus, supra,* 120 P. 737, 741) the line of ordinary high water should not be taken as the basis from which to determine the center of the river. ▆▆▆ The rule that the thread of a nonnavigable river is to be ascertained from the measurement of the water at its lowest stage appears to be a logical one for the determination of the imaginary line known as the thread of a nonnavigable river or the middle of the main channel thereof. This rule was applied but was not specifically stated in *Drake* v. *Russian River Land Co., supra,* 10 Cal.App. 654. The court was there concerned with determining the boundary line of property bordering on the Russian River. Like other streams in this state, the Russian River is subject to floods when it is bank full, but in the season of low water the river, in the area under dispute, ran only in a channel along the north bank. The boundary line was found to be the center of this low water channel.

▆▆▆ The defendant also urges that ownership of the "island" in the bed and channel of the San Joaquin River at the point in dispute is to be further determined by the application of Civil Code, section 1017. This provides that "An island, or an accumulation of land, formed in a stream which is not navigable, belongs to the owner of the shore on that side where the island or accumulation is formed; or, if not formed on one side only, to the owners of the shore on the two sides, divided by an imaginary line drawn through the middle of the river." If the middle thread of the south channel is used as the boundary line under the principles of law above stated, the so-called "island" here involved would lie wholly on the plaintiffs' side of the boundary line and ownership thereof would vest solely in them.

The evidence fully supports the trial court's finding that the center line of the main channel of the San Joaquin River, or the south channel as shown on plaintiffs' Exhibit Number 2, is the true boundary line between the lands of the plaintiffs and the lands of the defendant, and that the defendant has no right, title or interest in and to the parcel of land in dispute.

The judgment is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Spence, J., McComb, J., and Peters, J., concurred.