FLOYD I. HOLMES, Appellee, v. ERNEST HAINES et al., Appellants.

No. 45735.

JANUARY 20, 1942.

Frank R. Thompson and Curtis W. Gregory, for appellee.

John G. Regan and Geo. J. Dugan, for appellants.

BLISS, C. J.—On September 13, 1912, George W. Marston owned the west half of the southeast quarter of Section 12, Township 78, North, Range 30, in Guthrie County, Iowa. This eighty-acre tract is crossed by the South Raccoon River, a non-navigable stream flowing in a southeasterly direction across the county. The outline below roughly shows the lands of the parties and the present and old course of the stream.

On the date above stated, Marston conveyed by warranty deed to John Thompson the following described land, to wit:

"Commencing at a point on the North Bank of the South Raccoon river Thirty-three (33) rods south of the Northeast corner of the West half (W½) of the Southeast Quarter (SE¼) of section Twelve (12), Township Seventy-eight (78) North, Range Thirty (30) west of the fifth P. M. Iowa, thence North Thirty-three (33) rods, to the Northeast corner of said

west half (W½) of said Southeast Quarter (SE¼) of section Twelve (12), thence West to the Northwest corner of the West half (W½) of the Southeast Quarter (SE¼) of said section Twelve (12), thence South One Hundred Nine (109) rods more or less to the North bank of the South Raccoon river, thence in an east and northerly direction following the west and north bank of said river to the place of beginning, containing 40 acres more or less.''

On February 27, 1913, Marston conveyed by warranty deed to William A. Stanley, twelve and one-half acres in the southwest quarter of the section, Official Lot 2 in the east half of the southeast quarter, and ''the West half (W½) of the Southeast quarter (SE¼) of Section Twelve (12), Except Commencing at a point on the North bank of the South

Raccoon river Thirty-three (33) rods South of the Northeast corner of the West half (W½), of the Southeast quarter (SE¼) of Section Twelve (12) Township Seventy-eight (78) North Range Thirty (30) West of the Fifth P. M. Iowa, thence North Thirty-three (33) rods to the Northeast corner of said West half (W½) of said Southeast quarter (SE¼) of Section Twelve (12) thence West to the Northwest corner of the West half (W½) of the Southeast quarter (SE¼) of said section Twelve (12) thence South One Hundred Nine (109) rods more or less to the North bank of the South Raccoon River, thence in an easterly and northerly direction following the West and North banks of the said river to the place of beginning.''

Neither deed contained any reservations in the grantor.

The plat we have set out is drawn from an exhibit introduced by the defendants, and the course of the river across the W½ of the SE¼, indicated by the letters A B D approximates its course about the time the above-mentioned deeds were given. The course of the river across the 80 acres indicated on the plat by the letters A B C D approximates its course at the time of this controversy. That part of the channel, B D, became filled and overgrown with timber years ago.

Holmes now claims to own all the land, with its accretions, which was conveyed, as above shown, to Stanley. He obtained his title by a receiver's deed executed June 4, 1935. The land in the W½ of the SE¼ was conveyed by the same description as used in the deed from Marston to Stanley. There were no reservations in the grantor.

The defendant Ernest Haines (E. B. Haines) received title to his land by a referee's deed, executed October 16, 1925, and the particular land in controversy was described the same as in the deed from Marston to Thompson. There were no reservations in the deed.

According to the testimony of several witnesses, one of whom had known the land since 1881, the river from its entrance into the eighty at about point D has been slowly but gradually eroding the north bank and moving northward. There was at one time a bayou north of the bed of the river between the points B and D. The river as it gradually and impercep-

tibly ate away the north bank deposited the accretions along the south bank until the old channel B D was filled and the new channel, over a period of many years, assumed the horseshoe course B C D, and the tract of land within the horseshoe marked "X" became accreted land by reason of deposits along the south bank of the stream. Along the toe of the horseshoe where the later accretions were deposited there is little vegetation. Further south young willow, cottonwood, maple, and box elder trees are growing, but as the opening of the horseshoe is approached, there is much heavy timber. Many of the trees being almost two feet in diameter. These trees are all growing upon accreted land.

During all of the years that the defendants and their immediate grantors have owned the land north, east, and west of the river, they have never made any claim to any of the land across the river. In fact, about 1939 the defendant, Alva Haines, offered the plaintiff $75 for a strip of ground, about where the old channel had been, for the purpose of reopening it. When this offer was refused, the defendants began chopping down trees and dynamiting a channel about 40 feet wide. Plaintiff then brought this suit to quiet title to all of the land on the southerly side of the present river channel, and to enjoin defendants from proceeding further with their tree chopping and channel blasting. A temporary injunction was issued.

The defendants filed answer setting up three defenses. First, that since the south boundary of their land in the eighty comes to the north *bank* of the river and then follows the west and north *banks* of the river to the point of beginning, it is a fixed and permanent boundary which has never changed or moved with the changes and movements of the bed and banks of the river. Second, that while this permanent boundary has never moved, it has become "lost, destroyed and in dispute," and the question should be tried as provided in chapter 521 of the 1939 Code of Iowa, with respect to disputed corners and boundaries. Third, that the plaintiff and his grantors had recognized and acquiesced in said permanent boundary for more than 10 years. The able trial court held that there was no merit in any of these defenses. Our study of the case fully satisfies us that the court was right.

■ I. Under the defendants' contention, the boundary line was on and along the bank, and not at the high-water, or the low-water, mark, or at the water's edge, or the thread or center of the stream. It was the plaintiff's theory that the boundary was at the low-water mark, or the thread of the stream. The trial court found no Iowa authorities that it considered directly decisive of the question. The court referred to Murphy v. Copeland, 51 Iowa 515, 1 N. W. 691; Murphy v. Copeland, 58 Iowa 409, 10 N. W. 786, 43 Am. Rep. 118, and Kerr v. Fee, 179 Iowa 1097, 161 N. W. 545. The description in Murphy v. Copeland, supra (51 Iowa 515, 1 N. W. 691), was "thence east to Pine creek, thence * * * up the west bank of Pine creek." The lower court in that case held that this description carried the boundary line to the center of the stream. This court (51 Iowa 515, 1 N. W. 691) reversed and held that the description excluded the stream. On the second appeal (58 Iowa 409, 10 N. W. 786, 43 Am. Rep. 118), this court held that the description carried the boundary line to the low-water mark. In Kerr v. Fee [179 Iowa 1097, 161 N. W. 545], supra, the deed conveyed land "lying and being on the right bank of White Breast Creek (or in the bend thereof)." This court held that in the absence of language indicating otherwise, the deed carried to the center of the creek. The court also said at page 1102 of 179 Iowa, page 546 of 161 N. W.:

"So, too, for like reason, the description in a deed of a boundary as the bank of a stream, or as beginning at a defined point on the bank and running along a nonnavigable stream, is presumed to run along the center of the stream, if the grantor's title so extends. Kent v. Taylor, 64 N. H. 489 (13 Atl. 419); Gould on Waters, Section 197 et seq."

In Compton v. Hites, 184 Iowa 1074, 1076, 169 N. W. 401, 74 A. L. R. 599, the deed conveyed land "lying east of the Shell Rock River." We held that the deed conveyed "to the thread, or center line of the stream."

All of the streams in these cases were nonnavigable.

It is not necessary and we will not attempt to lay down any general rule in this matter. In fact, it would hardly be possible.

The question can be properly answered only when the intention of the parties is determined in any particular case. As said in Waterford Electric Light, Heat & Power Co. v. State, 117 Misc. Rep. 480, 191 N. Y. S. 657, the question as to what line a conveyance of land along a stream carries title depends upon the intention of the parties, to be gathered from the terms of the conveyance, as interpreted by the surrounding circumstances, from a description of the premises read in connection with other parts of the deed or grant, and by reference to the situation of the lands and the condition and relation of the parties to those and other lands in the vicinity, and in some cases by acts or conduct subsequent to the grant.

In the case before us, it seems quite clear that the boundary line between the lands of the parties is the thread or the center of the stream. A concise definition of such a line is given in Gould on Waters, 3d Ed., section 198, page 383: ''The thread of a private stream is the line midway between the banks at the ordinary state of the water, without regard to the channel or the lowest or deepest part of the stream, and if the land upon one side is gradually and imperceptibly wearing away, and soil is deposited upon the other, it is the thread of the stream for the time being, and not that which existed when the opposite owners acquired their titles, which forms the boundary between their estates.'' Kerr v. Fee, supra, 179 Iowa 1097, 1101, 161 N. W. 545.

Marston, on September 13, 1912, owned these eighty acres. He owned the land on both sides of the stream, and since it was nonnavigable, he owned the bed of the stream. Noyes v. Collins, 92 Iowa 566, 568, 61 N. W. 250, 54 Am. St. Rep. 571, 26 L. R. A. 609. In his deed to Thompson conveying the land north of the stream, and in his deed to Stanley conveying the land south of the stream, he reserved no part of the land. There is nothing in either deed that either grantee was to be excluded from any riparian rights in the stream. And it is not reasonable to suppose that he wished to differentiate between the rights of the parties with respect to access to, and use of, the stream. If the contention of the appellants is the correct one, then Thompson and those holding under him had no title south of the north bank, and they were not riparian owners. It is our judgment

that this was not the intention of Marston or of any subsequent grantors of the land north of the river.

In Kerr v. Fee, supra, 179 Iowa 1097, 1101, 161 N. W. 545, 546, we said:

" 'The presumption is that no land is left without private ownership, and that the boundaries of the owners on opposite sides of the stream are in contact with each other; and the only place where they can touch without injustice to either owner is at the center of the stream.' "

In Gould on Waters, 3d Ed., section 195, page 377, the author said: "When riparian estates are conveyed, the owner may reserve the land under the water, but the general presumption is that the purchaser's title extends as far as the grantor owns in both tidal and fresh waters."

The authorities outside of this state are not in harmony respecting how far the conveyance carries under a description like the one here used. Authorities holding that it conveys only to the bank, and others that it carries to the low-water mark, or the water's edge, or the center of the stream may be found. See annotations to Hanlon v. Hobson, 24 Colo. 284, 51 P. 433, 42 L. R. A. 502 et seq.; 8 Am. Jur. (Boundaries), sections 25, 26, pages 763 et seq.; 74 A. L. R. 597, 601–604 et seq.; 11 C. J. S. (Boundaries), sections 25, 27 (c), 31, pages 570 et seq.; American Digest System (Boundaries), key numbers 12, 13, 14, 15; Gould on Waters, 3d Ed., section 200, page 385 et seq.

■ But, as stated by the trial court, the fact that the boundary line may have been the north and west banks of the river does not aid the appellants in any way. Whether the boundary line was the bank, the low-water mark, the water's edge, or the center of the stream, can make no difference, because whichever line is accepted as the boundary, it is tied to the river, and is a part of the river, and wherever the river moves or changes its bed, the boundary line moves and changes with it. The authorities uniformly hold that a river or stream can be a monument marking a boundary, but if the river changes its course or bed, the boundary necessarily changes with it. It necessarily follows that if any part of the river, as its bank or

its high- or low-water mark, is the boundary line, that line changes when the river changes its course.

In speaking of river boundaries between states, we said in Kitteridge v. Ritter, 172 Iowa 55, 57, 151 N. W. 1097: "It is the law that if by gradual and slow process the channel of the stream be changed, the boundaries of the respective states will change accordingly; that is to say, the stream will still be deemed the boundary between the states, notwithstanding the change in the channel." If this is true as between states, it is true between private owners.

II. There is another reason why the trial court was right. Under the allegations of the defendants' answer and under all of the proof, the change in the bed of the stream was slow and gradual over a period of many years. The erosion from the north and west banks of the stream and its accretion to the south bank was just as slow and gradual through the same period of years. All of the land within the horseshoe bend, or the loop of the new channel, is land accreted to the south shore of the river, and is the property of the appellee, regardless of whether the boundary line was the bank of the river, or in or along the stream.

In Coulthard v. Stevens, 84 Iowa 241, 245, 50 N. W. 983, 984, 35 Am. St. Rep. 304, we adopted the definition of "accretion" given in Benson v. Morrow, 61 Mo. 345, 352, to wit:

" 'The terms "alluvion," on the one hand, and "gradual" and "imperceptible" accretion, on the other, are used by writers to contradistinguish a sudden disruption of a piece of ground from one man's land to another, which may be followed and identified, from that increment which slowly or rapidly results from floods, but which is utterly beyond the power of identification. * * * The length of time during formation is not material.' "

As stated by Farnham, 1 Waters and Water Rights, section 69, page 320:

"One of the most valuable of the rights of the riparian owner is the right to preserve his contact with the water by

appropriating the accretions which form along his shore. * * * Land formed by accretion * * * becomes a part of the shore, and the riparian owner retains his title as far as the water. * * * [Section 70, page 324] When it is determined that a separate parcel of land is accretion or alluvion it is the property of the owner of the bank to which it forms, the same as though it had always existed there."

See also to the same effect State v. Livingston, 164 Iowa 31, 39, 40, 145 N. W. 91; Payne v. Hall, 192 Iowa 780, 783, 185 N. W. 912; Berry v. Hoogendoorn, 133 Iowa 437, 440, 108 N. W. 923; McFerrin v. Wiltse, 210 Iowa 627, 629, 231 N. W. 438.

The appellants failed to prove that any boundary line between the lands of the parties had been recognized or acquiesced in for any period of time except the boundary line formed by the river.

Appellants' motion to try the case under Code chapter 521 was rightly denied.

The judgment and decree is affirmed.—Affirmed.

SAGER, OLIVER, HALE, GARFIELD, MILLER, and WENNER-STRUM, JJ., concur.

STIGER, J., takes no part.